**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DANIELLE MULL, appointed Guardian Ad Litem for Carson Mull; NORMAN MULL; CARSON MULL, *Plaintiffs-Appellees*, <br><br> v. <br><br> MOTION PICTURE INDUSTRY HEALTH PLAN; BOARD OF DIRECTORS OF MOTION PICTURE INDUSTRY HEALTH PLAN, *Defendants-Appellants.* | No. 20-56315 <br><br> D.C. No. 2:12-cv-06693-VBF-MAN <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Valerie Baker Fairbank, District Judge, Presiding

Argued and Submitted January 11, 2022
Pasadena, California

Filed July 25, 2022

Before: Richard R. Clifton, Milan D. Smith, Jr., and
Paul J. Watford, Circuit Judges.

Opinion by Judge Clifton

**SUMMARY**[*]

---

**Employee Retirement Income Security Act**

The panel reversed the district court's summary judgment in favor of plaintiffs in an action against the Motion Picture Industry Health Plan and the Plan's Board of Directors, alleging violation of the Employee Retirement Income Security Act of 1974, and remanded with instructions for the district court to enter summary judgment in favor of the Plan.

Plaintiff Norman Mull was a participant in the Plan. After his daughter, a covered dependent, was injured in a car accident, the Plan paid benefits to cover a portion of her medical expenses. Under the Plan's terms, Mull was liable to the Plan for the reimbursement of these benefits if the daughter recovered money from the third party who caused her injuries. Although the daughter obtained such a recovery, she dissipated her settlement funds without reimbursing the Plan, and Mull did not pay the reimbursement amount himself. Invoking a self-help provision in the Plan's terms, the Plan stopped making benefit payments to Mull and his covered dependents to recoup its unreimbursed payments. Plaintiffs brought this action to recover the benefits withheld by the Plan and to force the Plan to make benefit payments for covered services in the future. The district court granted summary judgment in favor of plaintiffs, concluding that the Plan could not enforce its self-help remedy.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Reversing, the panel concluded that contractual defenses could not defeat the clear and unambiguous terms setting forth the Plan's self-help remedy.  Assuming without deciding that plaintiffs could invoke the equitable doctrines of illegality, impossibility of performance, and unconscionability, the panel concluded that these defenses could not override the terms of the Plan under the facts in this case.

The panel held the requirements for establishing a fiduciary's claim for equitable relief under ERISA § 502(a)(3), including the existence of an identifiable fund in the possession and control of the person from whom recovery is sought, did not bar the Plan from exercising its self-help remedy as an alternative means of recouping its overpaid benefits.  The panel explained that the Plan was not prosecuting an action for equitable relief under § 502(a)(3), but rather was a defendant in an action that plaintiffs themselves had brought to recover benefits and was using a self-help remedy that required no judicial enforcement.

Agreeing with other courts, the panel held that the Plan's self-help remedy did not undermine ERISA's civil enforcement scheme.  Rather, ERISA plan fiduciaries may bargain for and implement self-help remedies that do not require judicial enforcement.

Finally, the panel held that res judicata did not bar the Plan's use of its self-help remedy.

**COUNSEL**

Kathryn J. Halford (argued) and Elizabeth Rosenfeld, Wohlner Kaplon Cutler Halford & Rosenfeld, Encino, California, for Defendants-Appellants.

Donald M. de Camara (argued), Law Office of Donald M. de Camara, Carlsbad, California; Daniel E. Wilcoxen and Drew M. Widders, Wilcoxen Callahan LLP, Sacramento, California; for Plaintiffs-Appellees.

**OPINION**

CLIFTON, Circuit Judge:

Plaintiffs brought this action against the Motion Picture Industry Health Plan (the "Plan") and the Plan's Board of Directors under § 502(a)(1)(B) and § 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff Norman Mull ("Norman") is a participant in the Plan.[1] The remaining Plaintiffs are covered dependents of Norman. Norman's daughter, Lenai Mull ("Lenai"), who is no longer a party to this action, was formerly a covered dependent of Norman.

After Lenai was injured in a car accident, the Plan paid benefits to cover a portion of her medical expenses. Under the Plan's terms, Norman was liable to the Plan for the reimbursement of these benefits if Lenai recovered money from the third party who caused her injuries. Although Lenai obtained such a recovery, she dissipated her settlement

---

[1] Because Plaintiffs share the same last name, we refer to them individually by their first names.

funds without reimbursing the Plan, and Norman did not pay the reimbursement amount himself.  Invoking a self-help provision in the Plan's terms, the Plan stopped making benefit payments to Plaintiffs to recoup its un-reimbursed payments.

Plaintiffs brought this action to recover the benefits withheld by the Plan and to force the Plan to make benefit payments for covered services in the future.  The district court ultimately granted summary judgment in favor of Plaintiffs, concluding that the Plan could not enforce its self-help remedy.

This conclusion was in error.  Contrary to the district court, we conclude that contractual defenses cannot defeat the clear and unambiguous terms of the Plan, at least not in this instance.  We also conclude that the Plan's self-help remedy does not violate ERISA § 502(a)(3), does not undermine ERISA's civil enforcement scheme, and is not barred by res judicata.  We reverse and remand with instructions for the district court to enter summary judgment in favor of the Plan.

## I.  Background

Norman worked for more than 21 years as a wrangler in the motion picture industry, caring for livestock used in the production of movies.  Through his employment and his membership in the Teamsters Union, Norman is entitled to receive healthcare benefits as a participant in the Plan. Norman's wife, Plaintiff Danielle Mull ("Danielle"), and their younger daughter, Plaintiff Carson Mull ("Carson"), are entitled to receive benefits as covered dependents of Norman.  When the events giving rise to this action occurred,

Norman and Danielle's older daughter, Lenai, was also a covered dependent of Norman.[2]

## A.  The Motion Picture Industry Health Plan

The Plan is a self-funded, multi-employer health and welfare benefit plan as defined in ERISA.  *See* 29 U.S.C. § 1002.  A Board of Directors (the "Board") administers the Plan and determines "all questions" regarding the "nature, amount, and duration" of benefits provided under the Plan.

The terms of the Plan itself are set forth in two documents.  The first document, the Motion Picture Industry Plan Agreement and Declaration of Trust (the "Trust Agreement"), outlines procedures for funding, operating, and amending the Plan.  The second document, the Motion Picture Industry Health Plan Summary Plan Description for Active Participants (the "Plan Description"), sets forth the benefits available under the Plan and the conditions for receiving those benefits.  The dispute in this case stems from two provisions in the Plan Description.  These provisions take effect if and when the Plan pays benefits related to an injury for which a third party is legally responsible—for example, when a beneficiary is injured in a car accident caused by someone else.

The first provision (the "Reimbursement Clause") states that if a Plan participant or eligible dependent suffers such an injury, the Plan will pay benefits *only* if the participant

---

[2] Lenai remained a covered dependent of Norman until January 2015, after which she obtained healthcare coverage through her employer.  Although Lenai continued to participate in this action after she was no longer covered under the Plan, she has not participated in this appeal.  Throughout this opinion, "the Mulls" may refer either to the current Plaintiffs or the Mull family as a whole, including Lenai.

agrees to reimburse the Plan from any amount he or his eligible dependent subsequently recovers from or on behalf of the third party.  The Plan Description establishes several corollary requirements to ensure that the participant complies with this provision.  For example, before the Plan will pay benefits related to a third-party injury, the participant must execute a lien in favor of the Plan on the amount of any potential third-party recovery.  The Plan Description also requires that any such recovery be kept separate from other funds and be held in trust until conveyed to the Plan.  Even if the third-party recovery was received by a dependent, the Plan Description specifies that reimbursement "is the liability of the [p]articipant."

The second provision (the "Recoupment Clause") establishes a self-help remedy that may be used if the participant fails to comply with the Reimbursement Clause. Under this provision, if the participant fails to reimburse the Plan from a third-party recovery, the amount of un-reimbursed benefit payments that were made to treat the injury "will be deducted from all future benefit payments to or on behalf of the [p]articipant and/or any dependent, until the overpayment is resolved."[3]  If the amount paid by the Plan is not reimbursed from the third-party recovery as required, "the [p]articipant (and eligible dependent, if applicable) shall continue to owe to the Plan such unpaid amount, up to the full amount of the [third-party] [r]ecovery."

---

[3] The Plan Description uses the term "overpayment" to refer to the amount of benefit payments that have not been reimbursed from a third-party recovery.

### B   *Lenai Mull's Injury and Third-Party Recovery*

Lenai suffered serious injuries in February 2010 after the driver of the vehicle in which she was a passenger lost control and drove the vehicle off a 20-foot embankment. As a result of the accident, Lenai had to undergo multiple surgeries. The following month, the Plan sent a letter to Norman indicating that it had received a claim for treatment of Lenai's injuries. In its letter, the Plan noted that Lenai's injury appeared to have been caused by a third party. Consistent with the terms of the Plan Description, the Plan stated that it would not pay benefits to cover Lenai's treatment unless Norman executed a lien in favor of the Plan on any potential third-party recovery. The letter also advised Norman to "take time to review" the Plan Description section pertaining to claims involving third-party liability.

To ensure the payment of benefits, Norman was required to complete and return a "Third Party Liability Statement Form" attached to the letter. Section 9 of the form, labeled "THIRD PARTY LIEN," included the following statement:

> [I]f any amounts are received by me or by any person acting on my behalf as a result of court judgment, arbitration award, settlement or any other arrangement from any third party or any third party insurer or from my uninsured or underinsured motorist coverage related to any illness or injury, I agree to pay such amounts or have such amounts paid to the Plan to the extent necessary to reimburse the Plan for any benefits paid with respect to such illness or injury with applicable interest on such amounts.

> I hereby grant a lien in favor of the Plan for the amount to which the Plan is entitled in accordance with the prior paragraphs from the proceeds from any such court judgment, arbitration award, settlement or any other arrangement or from any amount received under uninsured or underinsured motorist coverage.

Norman and Lenai both signed the statement on April 20, 2010, and returned the form. In signing the form and accepting the Plan's payment of benefits, Norman, as the Plan participant, acknowledged responsibility for reimbursing the Plan in the event that Lenai recovered money from a third party. The Plan subsequently paid $147,948.38 in benefits to cover treatment of Lenai's injuries.

In April 2011, Lenai received a $100,000 settlement from the insurance carrier of the driver who caused her injuries. Because Lenai was over 18 at the time of her injury and subsequent settlement, the proceeds of the settlement were paid directly to her. Consistent with the Reimbursement Clause, the Plan requested that Lenai reimburse it for the benefit payments she had received.[4] The

---

[4] Although the Plan initially requested reimbursement of its lien in the amount of $147,948.38 (the amount in benefits it had paid in relation to Lenai's injury), it subsequently reduced its lien and reimbursement request to $100,000, the actual amount Lenai had received through her third-party recovery. The Plan Description provides that where, as here, "the benefits paid by the [Plan] in connection with the illness or injury exceeds the amount of the [third-party] [r]ecovery, neither the [p]articipant nor his or her eligible dependents shall be responsible for any benefits paid in excess of the amount of [such] [r]ecovery, other than interest as described [in the Plan Description]." Thus, under the Plan's

Plan also stated that if Lenai failed to respond within 30 days, it would begin deducting the un-reimbursed amount from future benefit payments pursuant to the Recoupment Clause.

Through counsel, Lenai declined to pay the full amount of her recovery and instead offered to pay an "equitably apportioned share" of $8,454.  The Plan rejected this offer and began to apply its recoupment procedures.  Thus, as the Plan received claims for Norman and his dependents, it would verify the claimant's eligibility and process the claim.  But instead of making payments to the service provider, the Plan would apply its share of covered expenses as a credit against Norman's reimbursement obligation.  Although Lenai's counsel submitted an appeal to the Plan's Benefits/Appeals Committee, which is authorized to interpret Plan provisions, the Committee denied the appeal in February 2012, and the Plan continued applying its recoupment procedures.

## C.  *The Mulls Bring This Action*

The Mulls sued the Plan in August 2012 and filed their First Amended Complaint ("FAC") in February 2013.  The FAC asserts a claim for injunctive relief under ERISA § 502(a)(3), which authorizes a "participant, beneficiary, or fiduciary" to bring a civil action "to enjoin any act or practice which violates" ERISA, or "to obtain other appropriate equitable relief."  29 U.S.C. § 1132(a)(3).  The Mulls allege that the Plan's "self-help" recoupment procedures have "effectively terminated" their health insurance, and that its "refus[al] to pay for physicals, cancer screenings and other

reimbursement provisions, Norman was liable to the Plan only for $100,000, plus interest.

preventive[-]type care" is causing them irreparable harm. The FAC also asserts a claim for the recovery of withheld benefits under ERISA § 502(a)(1)(B), which authorizes a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

After the Plan filed its Answer in March 2013, the Supreme Court decided *US Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013).  In *US Airways,* the Court held that when the administrator of an ERISA plan sues a beneficiary under § 502(a)(3) to enforce a reimbursement provision like the one in this case, the terms of the plan are controlling, and a beneficiary cannot invoke certain equitable defenses to "override the clear terms of a plan."  *Id.* at 91.

The Plan sought leave to amend its Answer to assert a counterclaim against Norman and Lenai in view of *US Airways*.  In their opposition to the Plan's application, the Mulls conceded that Lenai had dissipated "much of her personal injury recovery" and argued that if the Plan were allowed to bring a counterclaim, Lenai would be forced to seek bankruptcy protection.  Nevertheless, the district court granted the application in February 2014, and the Plan asserted a counterclaim against Norman and Lenai under § 502(a)(3), seeking to impose a constructive trust or equitable lien upon the proceeds of Lenai's third-party recovery.

Lenai filed for Chapter 7 bankruptcy in the U.S. Bankruptcy Court for the Eastern District of California in February 2014, automatically staying the Plan's counterclaim against her.  *See* 11 U.S.C. § 362(a).  The bankruptcy court ordered Lenai's discharge in August 2014,

and the bankruptcy court issued its final decree in January 2015. The district court accordingly granted Lenai judgment on the Plan's counterclaim.

Meanwhile, as Lenai's bankruptcy case was proceeding, the district court granted Norman's Rule 12(b)(6) motion to dismiss the Plan's counterclaim against him. As discussed in greater depth below, the court concluded that the Plan had made conflicting statements to the court and was judicially estopped from establishing an essential element of its claim.

Four months after dismissing the Plan's counterclaim against Norman, the district court granted the Mulls' motion for summary judgment on the FAC. The court reasoned that the Plan Description did not constitute a formal part of the Plan itself, and thus, any provision in the Plan Description, such as the Reimbursement or Recoupment Clause, was unenforceable.[5]

The Plan appealed the district court's final judgment to this court, which vacated and remanded. *Mull ex rel. Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1210 (9th Cir. 2017).[6] We concluded that "by clear design reflected in provisions" of both the Trust Agreement and the

---

[5] After Lenai emerged from bankruptcy and the automatic stay had been lifted, the district court resolved Lenai's outstanding claims under the FAC, concluding that her claims were largely moot or, to the extent they relied on the Plan Description, barred by judicial estoppel. Consistent with its summary judgment decision, however, the court held that Lenai was entitled to judgment on her claim that the Reimbursement and Recoupment Clauses fell outside the Plan and were therefore unenforceable.

[6] The Plan did not appeal (or, in the case of Norman, abandoned its appeal of) the district court's rulings dismissing the Plan's counterclaim against Norman and Lenai.

Plan Description, "the two documents *together* constitute" an employee benefit plan under ERISA.  *Id.* at 1210.  Thus, we explained, the Plan is comprised of the "Trust Agreement plus the [Plan Description]."  *Id.*

On remand, the district court initially granted summary judgment for the Plan, explaining that, because the Plan Description constitutes a Plan document with enforceable terms, the Mulls are "effectively seeking benefits to which they are expressly not entitled under the terms of the [P]lan." Declining to enforce these terms on the basis that they are "unfair," the court added, would violate the Supreme Court's conclusion in *US Airways* that equitable principles cannot override the clear terms of an ERISA plan.

Eight months later, however, the district court reversed course.  After the Mulls filed a motion for reconsideration, the court vacated its prior judgment and granted summary judgment for the Mulls.  The court's ruling rested on four conclusions: first, that because the Plan could not prevail in an action for equitable relief under ERISA § 502(a)(3), it may not use a self-help measure to recoup overpaid benefits; second, that this measure constitutes an "extra-judicial remedy" that violates ERISA's "exclusive" civil enforcement scheme; third, that this measure runs afoul of equitable principles by imposing obligations on family members "who recovered nothing" and cannot pay back the recovery; and fourth, that the Plan's "claim" to un-reimbursed benefit payments is barred by res judicata given (i) the two final judgments dismissing the Plan's counterclaim against Norman and Lenai, and (ii) the Plan's failure to name Danielle and Carson as defendants in its counterclaim.

This appeal followed.

## II. Discussion

We have jurisdiction to review the district court's grant of summary judgment under 28 U.S.C. § 1291. *Nationstar Mortg. LLC v. Saticoy Bay LLC, Series 9229 Millikan Ave.*, 996 F.3d 950, 954 (9th Cir. 2021). We review findings of fact for clear error, *Metro. Life Ins. Co. v. Parker*, 436 F.3d 1109, 1113 (9th Cir. 2006), and conclusions of law de novo, *Conestoga Servs. Corp. v. Exec. Risk Indem., Inc.*, 312 F.3d 976, 981 (9th Cir. 2002).

On appeal, the Plan challenges each of the four grounds on which the district court relied in granting summary judgment for the Mulls. We address each argument in turn.

### A. Contractual Defenses Cannot Defeat the Plan's Self-Help Remedy

Under the terms of the Plan Description, if a beneficiary receives a third-party recovery following the Plan's payment of benefits, "[r]eimbursement of [those] benefits . . . *is the liability of the [p]articipant*." (Emphasis added.) Thus, by signing the Third Party Liability Statement Form and accepting the Plan's payment of benefits, Norman acknowledged liability for the repayment of those benefits. Plaintiffs do not dispute this fact. Nor do they dispute that the Plan Description authorizes the Plan to institute its recoupment procedures and suspend the payment of benefits as it has done in this case. They argue, however, that we should decline to enforce this Plan provision under basic principles of equity.

Although the district court's decision relied in part on various aspects of the ERISA statute (discussed below), the court appeared to invoke equitable considerations as an

additional basis for its conclusion.  In particular, the court said that the Plan should not be permitted to use "self-help measures" to "terminate plan benefits of family members who recovered nothing" and now "have no way to pay the [P]lan back."  Repackaging this conclusion in doctrinal terms, Plaintiffs argue that even if the Plan's recoupment provision is permissible under ERISA, this provision should still be "subject to all contractual defenses."  In particular, they invoke the doctrines of illegality, impossibility of performance, and unconscionability.[7]

There was a time in this circuit when parties could assert a range of equitable defenses to defeat the terms of an ERISA plan.  In *CGI Technologies & Solutions Inc. v. Rose*, 683 F.3d 1113 (9th Cir. 2012), *vacated*, 569 U.S. 945 (2013), we held that a district court, "in granting '*appropriate* equitable relief,' may consider traditional equitable defenses notwithstanding express terms disclaiming their application." *Id.* at 1123 (citation omitted).  Thus, we "disagree[d] with . . . other circuits to the extent that they ha[d] held that § 502(a)(3) categorically excludes

---

[7] One peculiarity of Plaintiffs' argument stems from the fact that illegality, impossibility of performance, and unconscionability are typically raised as affirmative defenses by the party being sued on a contract.  Here, however, the Mulls are asserting these doctrines in their capacity as *plaintiffs*.  Though Plaintiffs do not address this wrinkle, we note that under § 502(a)(1)(B), "[r]elief may take the form of . . . a declaratory judgment on entitlement to benefits," *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 53 (1987), and, in the analogous context of an action under the Declaratory Judgment Act, it is clear a plaintiff may seek to have a contractual provision declared unenforceable based on a doctrine such as illegality, *see United Food & Com. Workers Local Union Nos. 137, 324, 770, 899, 905, 1167, 1222, 1428, & 1442 v. Food Emps. Council, Inc.*, 827 F.2d 519, 520–21, 525 (9th Cir. 1987).  We assume without deciding that a plaintiff seeking declaratory relief under § 502(a)(1)(B) may do the same.

the application of traditional equitable defenses where the plan disclaims their application and requires reimbursement as set by the plan." *Id.* Although *CGI Technologies* involved a fiduciary's claim against a beneficiary, our reasoning broadly suggested that courts may consider equitable principles when interpreting the terms of an ERISA plan, even where a beneficiary has sought relief against the plan fiduciary. But the Supreme Court vacated our court's decision in *CGI Technologies*. *See* 569 U.S. 945. Our panel subsequently remanded the case to the district court in light of *US Airways*, so our prior opinion is no longer good law. *CGI Techs.*, 727 F.3d 950 (9th Cir. 2013) (mem.).

*US Airways* held that in an action to enforce the terms of a medical benefits plan, the defendant could not rely on two specific equitable defenses deriving from principles of unjust enrichment to "override the clear terms" of a plan's reimbursement provision. 569 U.S. at 91. Where a court is asked to "hold[] the parties to their mutual promises," the Supreme Court explained, it must "declin[e] to apply rules— even if they would be 'equitable' in a contract's absence— at odds with the parties' expressed commitments." *Id.* at 98. Principles of unjust enrichment "are 'beside the point' when parties demand what they bargained for in a valid agreement." *Id.* Thus, the Court concluded, "[n]either general principles of unjust enrichment nor specific doctrines reflecting those principles," including the "double-recovery" or "common-fund rules" invoked by the defendant, "[could] override the applicable contract. *Id.* at 106.

After *US Airways*, it is clear that a party may not invoke principles of unjust enrichment to defeat the terms of a "valid agreement." *Id.* at 98. Although the Supreme Court did not clearly address whether contractual defenses such as

unconscionability, illegality, or impossibility of performance can defeat the clear terms of an ERISA plan, we need not decide that issue to resolve this appeal. Assuming without deciding that these defenses survive *US Airways*, we conclude that they still cannot override the terms of the Plan under the facts in this case.

Plaintiffs first argue that the Plan's recoupment provision constitutes an illegal undertaking. Although "[t]here is no statutory code of federal contract law," the Supreme Court's case law "leave[s] no doubt that illegal promises will not be enforced in cases controlled by the federal law." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) (gathering cases).[8] "Illegal bargains have been

---

[8] Although Plaintiffs' contractual arguments rely on California state law, "claims brought under [§] 502 of ERISA are federal claims, not state contract law claims." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1439 (9th Cir. 1990). In a case such as this, Congress has "empowered courts to 'develop a federal common law of rights and obligations under ERISA-regulated plans.'" *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 939 (9th Cir. 2017) (citation omitted). Thus, although we are "directed to formulate federal common law by considering both state law and governing federal policies," *Sec. Life Ins. Co. of Am. v. Meyling*, 146 F.3d 1184, 1191 (9th Cir. 1998), "the interpretation of ERISA insurance policies is governed by a uniform federal common law," not state law, *Evans*, 916 F.2d at 1439.

This feature of ERISA jurisprudence raises a threshold question neither party has addressed—specifically, "whether the body of federal common law contract principles Congress left to judicial development permissibly encompasses" the contractual defenses Plaintiffs raise here. *Nash v. Trs. of Bos. Univ.*, 946 F.2d 960, 964 (1st Cir. 1991). The Supreme Court has implicitly incorporated the doctrine of illegality into this body of federal common law already. *See Kaiser Steel*, 455 U.S. at 77–79. Because we conclude that neither unconscionability nor impossibility of performance may defeat the challenged Plan provisions under the facts of this case, we simply assume without deciding that both

classified both by the common law and in statutory enactments as those opposed to positive law, those which are contrary to morality and those which offend public policy." 5 Williston on Contracts § 12:1 (4th ed. 2021) (gathering cases).   Here, Plaintiffs argue that the Plan's recoupment provision is illegal because it circumvents § 502(a)(3) of ERISA, which they claim is the sole mechanism for obtaining relief against beneficiaries.   But this assertion simply duplicates their separate argument that the recoupment provision violates ERISA's "exclusive" civil enforcement scheme.   As we discuss at length in Part II.C, below at 28–34, plan fiduciaries may bargain for and implement self-help remedies that do not require a civil action under § 502(a)(3) to enforce.   That the recoupment provision eschews reliance on § 502(a)(3) does not render it an illegal undertaking.   Plaintiffs identify no other reason why we should decline to enforce the provision on grounds of illegality, and we have found none.

Plaintiffs next invoke the doctrine of impossibility of performance, arguing that the recoupment provision is unenforceable because the family lacks the means to satisfy Norman's reimbursement obligation, which now exceeds $200,000.   They also argue that it was legally impossible for Norman to comply with this obligation in the first place because Lenai had sole control over her settlement funds.[9]

---

doctrines, like illegality, are also incorporated into the federal common law of ERISA contract interpretation.

[9] Plaintiffs briefly suggest that an additional "impossibility" arises from the fact that "Lenai's recovery was legally discharged by the federal bankruptcy court."   As discussed in Part II.D, below at 34–39, the fact that the Plan's separate claim against Lenai was discharged in bankruptcy court has no bearing on Norman's liability to the Plan or the

The common-law doctrine of impossibility "excuses what would otherwise be a breach of contract under very limited and narrowly defined circumstances."  30 Williston on Contracts § 77:1 (4th ed. 2021).[10]  The doctrine provides that

> [w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

*United States v. Winstar Corp.*, 518 U.S. 839, 904 (1996) (quoting Restatement (Second) of Contracts § 261).  "The ultimate inquiry for purposes of the impossibility defense is whether the intervening changes of circumstance were so unforeseeable that the risk of increased difficulty or expense should not properly be borne by the promisor."  *Taylor-Edwards Warehouse & Transfer Co. v. Burlington N., Inc.*, 715 F.2d 1330, 1336 (9th Cir. 1983).

In this case, Lenai's decision to dissipate her settlement funds (rather than repay the Plan) is the supervening event on which Plaintiffs' impossibility arguments rests.  But it

---

enforceability of the recoupment provision.  Likewise, this fact has no relevance for determining whether changed circumstances have excused Norman's reimbursement obligation under the impossibility-of-performance doctrine.

[10] The doctrine of impossibility is now more commonly known as the doctrine of "impracticability."  30 Williston on Contracts § 77:1 (4th ed. 2021).

cannot be said that the "non-occurrence" of this event "was a basic assumption on which the contract was made," *Winstar Corp.*, 518 U.S. at 904, for the Plan itself anticipates the possibility of such an event when it specifies that reimbursement of benefits "is the liability of the [p]articipant" (Norman), even if the third-party recovery "is directly received" by a dependent (Lenai). Impossibility is not available as a defense where, as here, the contract provided for the contingency in question. *See id.* at 905–06. Moreover, this provision undermines any notion that Lenai's receipt and dissipation of her recovery was "so unforeseeable" as to warrant application of the impossibility defense. *Taylor-Edwards*, 715 F.2d at 1336. Tellingly, Plaintiffs do not attempt to argue that Lenai's dissipation of her settlement was unforeseeable at the time Norman acknowledged his reimbursement obligation and accepted the Plan's payment of benefits.[11] Under the facts of this case, the doctrine of impossibility cannot discharge Norman's reimbursement obligation.

Finally, Plaintiffs argue that the Plan's recoupment provision is unconscionable. "Unconscionability refers to 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (citation omitted). To determine whether a contractual provision is

---

[11] Though Plaintiffs argue they had no control over Lenai's disposition of her settlement funds, they do not suggest this fact was unforeseeable. In any event, the fact "a promisor is unable to control the actions of a third person whose consent or cooperation is needed for performance of an undertaking ordinarily is not regarded as impossibility such as would avoid an obligation or excuse liability, unless the terms or nature of the contract indicate that this risk was not assumed." 30 Williston on Contracts § 77:1 (4th ed. 2021).

unconscionable, most courts today focus on both procedural and substantive aspects of the provision. *See* 8 Williston on Contracts § 18:9 (4th ed. 2021) (gathering cases).

Procedural unconscionability "focus[es] on 'oppression' or 'surprise' due to unequal bargaining power." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340 (2011) (applying California law). The only argument Plaintiffs appear to offer with respect to procedural unconscionability is that "plan members . . . have zero input into what provisions" go into the Plan. But Plaintiffs have not provided any evidence regarding "the manner in which the contract was negotiated and the circumstances of the parties at that time," information that is vital to a determination of procedural unconscionability. *Ingle*, 328 F.3d at 1171 (citation omitted). Moreover, we learn from a review of the record that the Plan was the product of collective bargaining negotiations, a fact that undermines Plaintiffs' claim of procedural unconscionability. *See Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1158 (9th Cir. 2008).

Substantive unconscionability "is concerned not with a simple old-fashioned bad bargain but with terms that are unreasonably favorable to the more powerful party." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261 (9th Cir. 2017) (citation omitted). Thus, we have most commonly concluded that a provision is substantively unconscionable in the context of arbitration provisions in employment agreements, where employers have significantly more bargaining power than employees. For example, in *Lim v. TForce Logistics, LLC*, 8 F.4th 992 (9th Cir. 2021), we invalidated a set of cost-splitting, fee-shifting, and venue provisions that were so "prohibitively costly" as to "deprive[] [the employee] of any proceeding to vindicate his rights." *Id.* at 1001–05. Likewise, in *Chavarria v. Ralphs*

*Grocery Co.*, 733 F.3d 916 (9th Cir. 2013), we invalidated a provision that apportioned large arbitration fees between an employer and employee up front, regardless of the claim's merits, and simultaneously limited the arbitrator's authority to allocate costs in the arbitration award. *Id.* at 925–26.

But the Plan's recoupment provision does not contain the kind of "unduly oppressive" terms we have recognized as substantively unconscionable in the past. *Lim*, 8 F.4th at 1002. For example, Plaintiffs overlook the fact that Norman agreed to the provision *in exchange* for medical benefits that his daughter subsequently received. Although the Plan authorizes a harsh remedy, the recoupment provision is predicated on an exchange that is not so "one-sided" as to "shock[] the conscience." *Chavarria*, 733 F.3d at 923 (citation omitted). Moreover, as we discuss in Part II.C, below at 28–34, numerous courts have upheld similar recoupment provisions.

Because the Mulls' contractual defenses would not render the recoupment provision unenforceable, we must return to the clear and unambiguous language of the Plan Description, which enables the Plan to recoup its overpaid benefits just as it has done. We must also confront the fact that Norman, having been urged to review the Plan Description provisions regarding third-party liability, acknowledged liability for the reimbursement of benefits. As noted, the Plan Description makes clear that reimbursement "is the liability of the [p]articipant," i.e., Norman, even if the third-party recovery is "directly received by" an "eligible dependent," i.e., Lenai. Thus, Norman knew (or should have known) that he would be responsible for reimbursing the Plan even if he had no control over Lenai's disposal of the third-party recovery. He signed the reimbursement agreement and accepted the Plan's

payment of benefits.  Having done so, he is bound by the Plan terms.

B. *The Requirements for Establishing a Claim for Equitable Relief Under § 502(a)(3) Do Not Bar the Plan from Exercising Its Self-Help Remedy*

The district court also reasoned that because the Plan could not prevail against the Mulls in an action for equitable relief under § 502(a)(3), it may not use a self-help measure as an alternative means of recouping its overpaid benefits. This conclusion was incorrect.

Section 502(a)(3) of ERISA authorizes plan fiduciaries to bring a civil action "to obtain . . . appropriate equitable relief . . . to enforce . . . the terms of the plan."  29 U.S.C. § 1132(a)(3).   The term "equitable relief," the Supreme Court has explained, refers only to "those categories of relief that were *typically* available in equity" during the era of the divided bench. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993).  Under the Court's precedents, whether a remedy is equitable or legal depends on (1) the basis for the plaintiff's claim and (2) the nature of the underlying remedy. *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142 (2016).  Applying these principles in a line of cases over the last two decades, the Court has clarified the circumstances in which a plan fiduciary may (and may not) secure relief under § 502(a)(3).

The Court has established, for example, that fiduciaries cannot use § 502(a)(3) to impose personal liability on a beneficiary based on a contractual obligation to pay money. In *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), an ERISA plan covered a beneficiary's medical expenses subject to a reimbursement provision like the one in this case.  *Id.* at 207.  After the beneficiary and her

then-husband recovered money from the third party who caused her injuries, the plan's insurer sued the couple under § 502(a)(3) to enforce the terms of the reimbursement provision. *Id.* at 207–08. The Supreme Court held that the suit was not authorized because the "nature of the underlying remed[y]" sought by the insurer was not equitable in nature. *Id.* at 213. As the Court explained, suits "seeking . . . to compel the defendant to pay a sum of money to the plaintiff are suits for money damages," and money damages are "the classic form of *legal* relief." *Id.* at 210 (citations and internal quotation marks omitted).

Although the insurer in *Great-West* tried to characterize its action as equitable under two different theories, the Court found neither persuasive. First, the insurer argued that it was seeking to enjoin a particular act that violated the terms of the plan, that is, the beneficiaries' failure to make reimbursement payments. *Id.* at 210. But as the Court observed, an injunction to enforce a monetary obligation in a contract was not typically available in equity. *Id.* at 210–11. Second, the insurer described its requested remedy as restitution, characterizing this as a type of equitable relief. *Id.* at 212. The Court rejected this argument, explaining that "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds . . . in the defendant's possession." *Id.* at 214. In *Great-West*, the funds sought by the insurer were not in the beneficiaries' possession, and thus, the restitution it sought was not equitable in nature. *Id.*

In *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356 (2006), by contrast, the Supreme Court held that the basis for the plaintiff's claim and the remedy it sought were both equitable. In that case, the beneficiaries secured a recovery from the third party responsible for

causing their injuries but then failed to reimburse their plan for benefits it had previously paid, thus violating the plan's reimbursement provision. *Id.* at 359–60. The plan sued the beneficiaries under § 502(a)(3), seeking to collect a portion of their third-party recovery that was preserved in certain investment accounts. *Id.* at 360.

The Court held that the basis for the claim was equitable because the plan sought to enforce an equitable lien "by agreement," a type of lien that arose through an agreement to convey a "particular fund" to another party. *Id.* at 363–65. The plan's requested remedy was also equitable in nature, for unlike the plaintiff in *Great-West*, the plaintiff in *Sereboff* "sought specifically identifiable funds that were within the possession and control of the [beneficiaries]," and thus, it did not seek to recover from the beneficiaries' "assets generally, as would be the case with a contract action at law." *Id.* at 362–63 (citation and internal quotation marks omitted).

The Court invoked *Sereboff* seven years later when deciding *US Airways*, in which it again concluded that a plan fiduciary sought an equitable remedy because it pursued "specifically identifiable funds" in the beneficiaries' control, namely "a portion of the settlement they had gotten." 569 U.S. at 95 (citing *Sereboff*, 547 U.S. at 362–63).

Finally, in *Montanile*, the Supreme Court considered whether a plan fiduciary can use § 502(a)(3) to attach a participant's general assets after the participant dissipates his settlement funds on nontraceable items. 577 U.S. at 139. In *Montanile*, as in the preceding cases, the plan required participants to reimburse it for medical expenses if they subsequently recovered money from a third party responsible for their injuries. *Id.* Though the participant secured such a recovery, he then dissipated nearly all of his settlement funds without honoring his reimbursement

obligation, thereby thwarting the plan's ability to pursue a specifically identifiable fund.  *Id.* at 140–41.  Accordingly, when the plan brought an action under § 502(a)(3), it could seek recovery only out of the participant's general assets.  *Id.* at 141.

The Court held that although the basis for the plaintiff's claim—an equitable lien by agreement—was equitable in nature, its requested remedy was not.  *Id.* at 144–46.  At equity, the Court explained, a plaintiff could not enforce an equitable lien if the "separate, identifiable fund to which the lien attached" was entirely dissipated on nontraceable items.  *Id.* at 146.  Although such conduct by the defendant may have been "wrongful," the plaintiff "could not attach the defendant's general assets instead."  *Id.* at 145.  Thus, even if a defendant flouts a plan's reimbursement requirement and dissipates his settlement funds, a plan fiduciary cannot use § 502(a)(3) to seek recovery from the defendant's general assets.  *See id.*

Invoking the Supreme Court's decisions in *Great-West*, *Sereboff*, *US Airways*, and *Montanile*, the district court observed that the Plan cannot seize specifically identifiable funds in the possession or control of the Mulls.  As discussed, Lenai had dissipated her settlement funds by sometime in 2013.  Because the Plan could not enforce its claim to reimbursement through an action for equitable relief under § 502(a)(3), the district court concluded that the Plan's recoupment remedy constitutes "an unlawful attempt to impose personal liability on the Mulls."  Pursuing this line of reasoning on appeal, the Mulls argue that the Plan's recoupment remedy "circumvent[s]" the "clear intent" of *Great-West* and subsequent cases, which require "that there . . . be an identifiable fund in the possession and control of the person from whom recovery is sought."

Though facially plausible, this argument does not hold up to closer scrutiny. It is true that under *Great-West* and subsequent cases, the Plan could not enforce its reimbursement provision through an action for equitable relief under § 502(a)(3), for there is no longer a specifically identifiable settlement fund from which it could seek recovery. *See, e.g.*, *Montanile*, 577 U.S. at 145–46. The Plan itself concedes as much. In this case, however, the Plan is not prosecuting an action for equitable relief under § 502(a)(3). Rather, it is a defendant in an action the Mulls themselves have brought to recover benefits.

Like the district court, the Mulls fail to distinguish (i) a fiduciary's action for equitable relief under § 502(a)(3) from (ii) a fiduciary's self-help remedy that can be implemented without legal action. *Great-West*, *Sereboff*, *US Airways*, and *Montanile* speak only to the former type of relief; they say nothing of the latter. Consequently, while these cases impose strict criteria for securing relief under § 502(a)(3), they do not limit, or even address, the types of self-help measures that may appear in an ERISA plan. In short, the *Great-West* line of cases does not govern this case, and the requirements those cases impose under § 502(a)(3) do not prevent the Plan from enforcing a clear term such as the one in this case.

The Mulls' reliance on *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083 (9th Cir. 2012), is misplaced for the same reasons. In *Bilyeu*, as in the cases just discussed, a plan fiduciary brought a claim under § 502(a)(3) to enforce a reimbursement provision in the plan. *Id.* at 1087–88. We therefore subjected the claim to the requirements discussed in *Great-West* and *Sereboff*, including the requirement that a fiduciary must seek recovery from "specifically identified funds in the

beneficiary's possession"—a condition that was not satisfied in *Bilyeu*. *Id.* at 1095 (emphasis omitted). Like the cases on which it relied, however, *Bilyeu* was concerned with actions brought by fiduciaries under § 502(a)(3). It did not address the scenario here, where a fiduciary has used a self-help measure that requires no judicial enforcement.

Because the Plan does not seek to enforce its recoupment provision through an action under § 502(a)(3), the *Great-West* line of cases is inapposite. These cases do not preclude—or say anything about—a fiduciary's ability to enforce a self-help provision like the one in this case. Nor do these cases address the permissible scope of such provisions. Thus, while the Plan could not enforce its reimbursement claim through an action under § 502(a)(3), that limitation does not bar it from enforcing its recoupment provision here.

### C. The Plan's Self-Help Remedy Does Not Violate ERISA's Civil Enforcement Scheme

The district court further concluded that the Plan's self-help remedy violates ERISA's "exclusive" civil enforcement scheme. According to the court, the remedies Congress provided in ERISA § 502 are meant to be exclusive, and thus, the Plan may not impose an extra-judicial remedy not set forth in the statute. The Mulls press the same theory here, arguing that if a plan fiduciary wishes to enforce the terms of a plan, it can do so only by bringing an action for equitable relief under § 502(a)(3).

The Mulls support their argument with a pair of passages from two Supreme Court cases, *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134 (1985), and *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41 (1987). When the

passages are restored to context, however, it is clear that neither case supports the Mulls' argument.

First, the Mulls cite *Massachusetts Mutual* for the proposition that "[t]he six carefully integrated civil enforcement provisions found in § 502(a) of [ERISA] . . . provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." 473 U.S. at 146. But by "other remedies," the Supreme Court was referring to other *causes of action*. *See* 473 U.S. at 145–48. In *Massachusetts Mutual*, a beneficiary sued her benefits plan for extracontractual compensatory or punitive damages based on the plan's temporary termination of benefits, despite the fact that the plan had subsequently restored benefits and paid all retroactive benefits to which the beneficiary was entitled. *Id.* at 136–37. The Court observed that "when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement," the Court is "reluctant to tamper with" such a scheme by supplying remedies not expressly provided in the statute. *Id.* at 147 (citation omitted). Although ERISA's text and legislative history reveal Congress's "purpose to protect contractually defined benefits," they show no corresponding intent to sanction the recovery of extracontractual damages. *Id.* at 148. Thus, the Court held that "Congress did not provide, and did not intend the judiciary to imply, a *cause of action* for extra-contractual damages" under ERISA. *Id.* (emphasis added). But *Massachusetts Mutual* did not address, let alone limit, a plan's ability to bargain for a self-help measures that may be used without bringing a legal action.

Second, the Mulls cite *Pilot Life* for the proposition that "[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies

embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive."   481 U.S. at 54.   As in *Massachusetts Mutual*, though, the Supreme Court was merely articulating the principle that ERISA excludes other *causes of action* not expressly authorized in the statute.  In *Pilot Life*, a participant sued his benefits plan after it terminated his long-term disability payments, but instead of bringing a cause of action under ERISA, he asserted three claims under state common law.  *Id.* at 43.   Invoking its reasoning in *Massachusetts Mutual*, the Court concluded once again that the "comprehensive civil enforcement scheme" in ERISA § 502(a) precludes separate causes of action not explicitly provided in the statute.  *Id.* at 54.  Congress, it noted, clearly intended § 502(a) to serve as the "exclusive vehicle for *actions* by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits," and thus, "varying state *causes of action* for claims within the scope of § 502(a)" would frustrate that congressional purpose.  *Id.* at 52 (emphases added).  Like *Massachusetts Mutual*, then, *Pilot Life* simply prevents a party from bringing a non-ERISA cause of action that falls "within the scope of § 502(a)."  *Id.*

Apart from their reliance on *Massachusetts Mutual* and *Pilot Life*, the Mulls cannot reconcile their argument with the fact that numerous courts, including this one, have upheld self-help remedies similar to the one in this case.

For example, in *Stuart v. Metropolitan Life Insurance Co.*, 664 F. Supp. 619 (D. Me. 1987), *aff'd*, 849 F.2d 1534 (1st Cir. 1988) (mem.) (per curiam), the plaintiffs had signed an agreement promising to reimburse their long-term disability plan using any retroactive Social Security disability payments they might eventually receive.  *Id.*

at 621. The agreement also authorized the plan to enforce this right to reimbursement "by withholding or reducing future long-term disability benefits." *Id.* When the plaintiffs failed to reimburse the plan as required, the administrator began to recoup the Social Security disability payments by withholding benefits. *Id.* Like the Mulls, the plaintiffs sued the plan under ERISA § 502(a)(1)(B) to recover the withheld benefits. *Id.* at 622 n.7. But the court, interpreting the "plain and unambiguous language of the [p]lan," upheld the recoupment provision and granted summary judgment for the plan. *Id.* at 623–24. The First Circuit subsequently affirmed. 849 F.2d 1534.

We relied on *Stuart* in deciding *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279 (9th Cir. 1990). As in *Stuart*, the plaintiff in *Madden* sued his long-term disability plan under ERISA § 502(a)(1)(B), arguing in relevant part that the plan should not be permitted to reduce his benefits by any Social Security disability award. *Id.* at 1282–83. Invoking *Stuart*, we observed that "courts have upheld the recovery of retroactive [S]ocial [S]ecurity awards by ERISA plans where such plans provide for the reduction of benefits by such awards." *Id.* at 1287. Because the plan in *Madden* explicitly "provide[d] for the reduction of [p]lan benefits by social security disability awards," we held that the plan was entitled to reduce the plaintiff's benefits by the amount of such awards. *Id.*

*Stuart* and *Madden* are not outliers: "Numerous courts have approved of the recoupment of retroactive [Social Security disability] awards." *White v. Coca-Cola Co.*, 514 F. Supp. 2d 1353, 1372 (N.D. Ga. 2007) (gathering cases), *aff'd*, 542 F.3d 848 (11th Cir. 2008). Nor has this practice been limited to the recoupment of Social Security disability payments. In *Nesom v. Brown & Root, U.S.A.,*

*Inc.*, 987 F.2d 1188 (5th Cir. 1993), for example, the Fifth Circuit held that a long-term disability plan could reduce its monthly payments to a beneficiary after the beneficiary received a retroactive workers' compensation award.  *Id.* at 1190–91.  After examining the relevant provision that authorized this relief, the court cited *Stuart* and *Madden* in concluding that the plan was "entitled to recoup the retroactive award from future benefits payable." *Id.* at 1194.

The Mulls try to distinguish this line of cases on two grounds, neither of which is persuasive.

First, the Mulls contend that these cases "are not on point because [they] involve[d] a plan member who was also a recipient of the 'identifiable fund' of the Social Security or workman's compensation payment."  Thus, "under the [*Great-West*]-*Montanile* line of cases," the plans could have a right to an equitable lien or constructive trust to recover their benefits" under § 502(a)(3).  But this argument obscures a significant distinction between the *Great-West* line of cases and those just discussed.  In *Stuart*, *Madden*, and *Nesom*, as in this case, the *beneficiary* was suing the *plan* under ERISA § 502(a)(1)(B).[12]  These cases did not involve a fiduciary's action for equitable relief under § 502(a)(3), and thus, the "identifiable fund" requirement discussed in *Great-West* and subsequent cases was of no relevance to their holdings.

Second, the Mulls argue that cases such as *Stuart*, *Madden*, and *Nesom* have little persuasive force because

---

[12] The same was true in other cases cited by the Plan that the Mulls suggest are distinguishable, namely *Northcutt*, *Nordby v. Unum Provident Insurance Co.*, No. 06-CV-117-EFS, 2009 WL 426123 (E.D. Wash. Feb. 20, 2009), and *Calloway v. Pacific Gas & Electric Co.*, 800 F. Supp. 1444 (E.D. Tex. 1992).

they "predate[] the [*Great-West*]-*Montanile* line of cases" construing the requirements for equitable relief under § 502(a)(3).  But for reasons already discussed, the *Great-West* line of cases does not impact the reasoning and conclusions in these earlier cases, which did not involve claims for equitable relief under § 502(a)(3).  Indeed, the Seventh Circuit's decision in *Northcutt v. General Motors Hourly-Rate Employees Pension Plan*, 467 F.3d 1031 (7th Cir. 2006), which came after *Great-West* and *Sereboff*, illustrates this principle.

In *Northcutt*, as in the cases just discussed, the plaintiffs were required to reimburse their benefits plan if they also received a retroactive award of Social Security disability payments for the same period.  467 F.3d at 1032–33.  If they failed to do so, the plan was authorized "to make appropriate deductions from any future compensation or insurance benefits" payable to the beneficiary.  *Id.* at 1033.  After the plan invoked its recoupment provision and began suspending the plaintiffs' benefits, the plaintiffs sued the plan under § 502(a)(1)(B), arguing, as the Mulls do here, that § 502(a)(3) "provides the *only* mechanism through which ERISA-covered entities may obtain reimbursement from plan participants for violations of plan provisions."  *Id.* at 1034.

The Seventh Circuit rejected this argument.  As the court explained, the Supreme Court cases interpreting ERISA— including *Massachusetts Mutual*, *Great-West*, and *Sereboff*—"lend no support to the view that Congress' fine-tuning of the *judicial* remedies available to various ERISA entities was intended to preclude extra-judicial contractual remedies such as the one at issue here."  *Id.* at 1036.  Whereas these cases focus narrowly on the "viability of some form of *judicial action* for relief outside the statutory

terms," they "simply do not address contractual reimbursement schemes" like the one here. *Id.* at 1037. Accordingly, the court affirmed the grant of summary judgment in favor of the plan. *Id.* at 1038. Since *Northcutt* was decided, other courts have adopted its reasoning, either explicitly or implicitly, in rejecting similar challenges under ERISA. *See, e.g.*, *White*, 542 F.3d at 858 (affirming district court decision that relied on *Northcutt* to uphold a contractual recoupment remedy, and observing that *Sereboff* was inapposite because the defendant had not sought judicial relief under § 502(a)(3)).[13]

In sum, the Plan's recoupment provision does not violate ERISA's civil enforcement scheme. As our court and others have recognized, plan fiduciaries may bargain for and implement self-help remedies that do not require judicial enforcement. *Great-West* and subsequent cases are not to the contrary.

### D.  Res Judicata Does Not Bar the Plan's Use of Its Self-Help Remedy

Finally, the district court concluded that the Plan's ability to enforce its recoupment provision is barred by res judicata. Res judicata "comprises two distinct doctrines regarding the preclusive effect of prior litigation." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S.

---

[13] A panel of the Sixth Circuit has explicitly adopted *Northcutt*'s reasoning, albeit in an unpublished opinion. *See Shaffer v. Rawlings Co.*, 424 F. App'x 422, 424–25 (6th Cir. 2011) (citing *Northcutt* for the proposition that neither *Great-West* nor *Sereboff* "speak[s] to extra-judicial contractual reimbursement schemes," and concluding that while these cases limit the scope of judicial relief under § 502(a)(3), they do not "prevent[] the parties from agreeing to follow the terms of a contract on their own").

Ct. 1589, 1594 (2020).   "The first is issue preclusion (sometimes called collateral estoppel), which precludes a party from relitigating an issue actually decided in a prior case and necessary to the judgment."   *Id.*   "The second doctrine is claim preclusion (sometimes itself called res judicata)."   *Id.*   The district court appeared to use res judicata in the latter sense, referring solely to claim preclusion.   *See Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 917 (9th Cir. 2012).   In particular, the court cited the two final judgments dismissing the Plan's counterclaim against Norman and Lenai.   It also noted that the Plan had not raised "the issue of its recoupment of benefits" in its counterclaim and had failed to name Danielle or Carson as defendants in that counterclaim.   Without elaborating, the court declared that the final judgments dismissing the Plan's counterclaim "serve as *res judicata* on the underlying obligation of the Mulls to the . . . [P]lan."

On appeal, the Mulls have tried to sharpen the district court's reasoning.   They argue, for example, that a ruling in favor of the Plan would be at odds with the final judgments dismissing the Plan's counterclaim, and that such an outcome would undermine res judicata's aim of preventing inconsistent judgments.   They also argue that under Rule 13 of the Federal Rules of Civil Procedure, the Plan was required "to raise all claims it had against the Mull family"— including its so-called "self-help" claim—"when it filed its counterclaim arising from the same transaction."   Given the Plan's failure to do so, the Mulls argue that res judicata bars it "from resurrecting" its "claims" for reimbursement against Danielle and Carson, who "should have been included as counter-defendants in the compulsory counterclaim."

Assuming without deciding that res judicata potentially applies,[14] we first address the argument that the final judgments dismissing the Plan's counterclaim against Norman and Lenai preclude enforcement of its recoupment provision.  The doctrine of claim preclusion provides that "a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (citation and internal quotation marks omitted).  Claim preclusion "applies only where there is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Turtle Island*, 673 F.3d at 917 (citation and internal quotation marks omitted).

Even assuming that claim preclusion potentially applies in this case, the first element of this defense is not satisfied here.  To determine whether there is an "identity of claims" between two actions, *id.*, courts must "determine whether successive lawsuits involve a single cause of action,"

---

**14** As a threshold matter, res judicata does not appear to be the appropriate doctrine to apply under the procedural posture of this case.  Though neither party raises this issue, it is well-established that "[r]es judicata applies as between separate actions, [but] not within the confines of a single action on trial or appeal."  18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction § 4404 (3d ed.); *see also, e.g.*, *Olivas-Motta v. Whitaker*, 910 F.3d 1271, 1280 (9th Cir. 2018).  In *United States v. Walker River Irrigation District*, 890 F.3d 1161 (9th Cir. 2018), we concluded that for purposes of res judicata, a counterclaim asserted within the same litigation did not constitute a separate action, and thus, "traditional claim preclusion and issue preclusion [did] not apply," *id.* at 1172.  Here, the final judgments that supposedly have preclusive effect stem from counterclaims asserted within *this action*.  Under *Walker River*, then, res judicata likely should not have come into play.  Nonetheless, because the parties did not brief this point, we do not decide the res judicata issue on these grounds.

*Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir. 1982).  The district court erred in concluding that the Plan's counterclaim against Norman and Lenai under § 502(a)(3) is "identical" to the "claim" it has raised as a defendant in this action.  For purposes of claim preclusion, a "claim" refers to a cause of action.  *See Costantini*, 681 F.2d at 1201.  But what the district court erroneously described as the Plan's "claim" is simply an argument, raised in its capacity as a *defendant*, that it is entitled to enforce the self-help provision in the Plan.  For the same reason, the Plan's failure to name Danielle or Carson in its counterclaim (an omission which might, under some circumstances, trigger preclusive effect) is irrelevant here, since there is simply no "claim" being asserted by the Plan that might be barred by res judicata.  Accordingly, the Mulls cannot defeat summary judgment based on claim preclusion.

Although the district court did not discuss the separate doctrine of issue preclusion, it would arguably provide a more apt framework for evaluating the preclusive effect (if any) of the prior judgments in this case.  In contrast to claim preclusion, issue preclusion "bars successive litigation of an *issue of fact or law* actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."  *Taylor*, 553 U.S. at 892 (emphasis added) (citation and internal quotation marks omitted).

Here, while the district court purported to bar the Plan from asserting a precluded "claim," it actually barred the Plan from raising a particular "issue of fact or law"— namely, whether Norman is liable for reimbursement of overpaid benefits, and, if so, whether the Plan may enforce its recoupment provision.  This issue, however, was not "actually litigated and resolved" in either of the judgments

dismissing the Plan's counterclaim. *Taylor*, 553 U.S. at 892 (citation omitted).

With respect to the Plan's counterclaim against Norman, the district court's dismissal of the counterclaim was based on what it perceived to be conflicting representations by the Plan. In its opposition to Norman's Rule 12(b)(6) motion, the Plan had stated that it sought to impose a constructive trust "upon any portion" of Lenai's recovery that was "in the possession or control" of Norman. In an earlier submission to the court, the Plan had stated that Lenai was "in possession of the remaining funds from her recovery." In the court's view, the Plan's more recent assertion contradicted its "earlier[,] unqualified statement" that the recovery was in Lenai's possession or control. Because the court had accepted the Plan's prior position, and because the Plan would obtain an unfair advantage if allowed to change its position, the court held that the Plan was judicially estopped from alleging that Norman had control or possession over any part of Lenai's recovery. Since a claim for equitable relief under § 502(a)(3) requires the plan administrator to seek specifically identifiable funds in the defendant's possession or control, the court held that the Plan's counterclaim against Norman failed to state a necessary element.

The district court dismissed the Plan's counterclaim against Lenai based on the claim's discharge in bankruptcy court. The Plan had brought an adversary action in the bankruptcy court to prevent the discharge of Lenai's debt, alleging that she had breached a fiduciary duty and committed defalcation in a fiduciary capacity. Despite this opposition, the bankruptcy court ordered Lenai's discharge in August 2014, and the Plan dismissed its action by

stipulation a month later and subsequently withdrew an objection to Lenai's personal injury exemption.

In sum, neither the bankruptcy court nor the district court ever ruled on whether Norman was liable to the Plan, let alone on whether the Plan's self-help provision was valid and enforceable. The Plan's counterclaim against Lenai and Norman was dismissed on entirely separate grounds. Because the relevant legal issues were never actually litigated and resolved at prior points in the litigation, the doctrine of issue preclusion—to the extent it applies at all— provides no more relief than claim preclusion.

In light of this conclusion, we need not reach the parties' remaining arguments.

## III.    Conclusion

Under the clear terms of the Plan Description, Norman is liable for the reimbursement of Lenai's benefits, and the Plan is authorized to recoup those benefits through its self-help provision. ERISA does not limit the use of such self-help remedies, and neither contractual doctrines nor res judicata prevent the Plan from enforcing this provision.

**REVERSED AND REMANDED for further proceedings with instructions to the district court to enter an order granting summary judgment in favor of the Plan.**